SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------X
                                   :

DEIRDRE LEANE and IPNAV, LLC,     :

                         Plaintiffs,    :     Index No.: **654614/2020**

              - against –         :

                                  :     **SUMMONS**

MISHCON DE REYA LLP, MISHCON    :
DE REYA NEW YORK LLP, KING &    :
WOOD MALLESONS LLP, ROBERT    :
WHITMAN and MARK RASKIN,      :

                    Defendants.  :
                                  :
--------------------------------------------------------X

TO THE PERSONS NAMED AS DEFENDANTS ABOVE:

      PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED TO ANSWER the
complaint of the plaintiff herein, and to serve a copy of your answer on the plaintiff at the
address indicated below, within 20 days after the service of this Summons (not counting the day
of service itself) or within 30 days after service is complete if the Summons is not delivered
personally to you within the State of New York.

      YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be
entered against you by default for the relief demanded in the complaint.

Dated: September 22, 2020
       New York, New York

                              KAMERMAN UNCYK SONIKER &
                              KLEIN P.C.

                            By:_____ /s/ *Akiva M. Cohen*_____
                              Akiva M. Cohen
                              1700 Broadway
                              New York, New York  10019
                              (212) 400-4930

                              *Attorneys for Plaintiffs*

Defendants Addresses:

Mishcon de Reya LLP, 70 Kingsway, London, United Kingdom, WC2B 6AH

Mishcon de Reya New York LLP, 2 Park Avenue, New York, New York, 10016

King & Wood Mallesons LLP, 500 Fifth Avenue, New York, New York, 10110

Robert Whitman, 80 Varick Street, Apt 8C, New York, NY 10013

Mark Raskin, 300 Mercer Street, Apt 8M, New York, NY 10003


Plaintiff designates New York County as the place of trial.  The basis for this designation is Defendant Mishcon De Reya New York LLP's principal place of business and the residence of Defendants Raskin and Whitman.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------X
                           :

DEIRDRE LEANE and IPNAV, LLC,      :

                        Plaintiffs,   :      Index No.: **6546l4/2020**

                           :

      - against –             :

                           :      **COMPLAINT**

MISHCON DE REYA LLP, MISHCON   :
DE REYA NEW YORK LLP, KING &    :
WOOD MALLESONS LLP, ROBERT   :
WHITMAN and MARK RASKIN,     :

                           :

                  Defendants.  :

                           :
--------------------------------------------------------X

      Plaintiffs, Deirdre Leane and IPNAV, LLC, by their attorneys, Kamerman, Uncyk,

Soniker & Klein P.C., as and for their Complaint against Defendants, Mishcon de Reya LLP,

Mishcon de Reya New York LLP, King & Wood Mallesons LLP, Robert Whitman and Mark

Raskin, respectfully allege as follows:

      1.     The attorney-client relationship is – should be – sacred.  Clients rely on their

attorneys to protect their interests in complex legal matters in which the attorneys are experts,

advisors, and confidants, and attorneys therefore owe their clients a duty of undivided loyalty

and integrity.  This litigation arises out of Defendants' egregious breach of that duty, to the

significant harm of Plaintiffs, who were their clients.

      2.     As detailed below, Plaintiffs Deirdre Leane ("Leane") and IPNAV, LLC

("IPNav"), in which Leane is the sole member, were clients of Defendants Mishcon de Reya

LLP ("Mishcon") and Mishcon de Reya New York LLP ("Mishcon NY" and, collectively

with Mishcon, "MdR"), and particularly of Defendants Robert Whitman ("Whitman") and

Mark Raskin ("Raskin" and, together with MdR and Whitman, the "Mishcon Defendants"), who were Partners at Mishcon NY.

3.      Despite that, in April, 2018, the Mishcon Defendants advised Ms. Leane and IPNav to retroactively terminate an Advisory Services Agreement ("ASA") between IPNav and non-party ChanBond, LLC ("ChanBond"), pursuant to which IPNav was entitled to 22% of the "Gross Recovery" (as defined in the ASA) on certain patents owned by ChanBond (the "ChanBond Patents"), which patents ChanBond had retained MdR to litigate.

4.      The Mishcon Defendants advised Plaintiffs that terminating the ASA was needed for the benefit of the patent litigation, and therefore was to her and IPNav's interest, and that ChanBond would put IPNav in an identical economic position via a new agreement that would be entered later.  MdR then drafted and advised Leane to sign a termination agreement between ChanBond and IPNav (the "Termination Agreement"), by which the ASA was retroactively terminated as of April 9, 2015 – the date as of which the ASA had first been executed.

5.      At no point did the Mishcon Defendants convey to Leane that MdR did not consider itself to be representing Leane or IPNav in connection with the Termination Agreement.  At no point did the Mishcon Defendants advise Plaintiffs to obtain independent counsel relating to the Termination Agreement.  At all times, and to all appearances, the Mishcon Defendants appeared to be performing their role as Leane's and IPNav's counsel, in addition to ChanBond's, and representing the parties' common (and, to Leane's knowledge, still wholly aligned) interests.

6.      That was not so, however.  The sole consideration for the Termination Agreement was ChanBond's representation that it would put IPNav in an economically identical position

by a new agreement to be later executed. Stunningly, MdR failed to document ChanBond's agreement to restore IPNav to an identical economic position, opting to protect the interests of one of its clients (ChanBond) by placing the interests of its other clients (Leane and IPNav) at risk.

7.      Moreover, when, after initially indicating that it would honor its commitment to restore IPNav's economic position, ChanBond reneged on the agreement, refused to do so, and attempted to strong-arm Plaintiffs into taking a reduced share of the Gross Recovery, Defendants Whitman and Raskin, now Partners in Defendant King & Wood Mallesons LLP ("KWM"), abandoned their duty to Plaintiffs and defended ChanBond's breach of contract.

8.      Indeed, and, upon information and belief, attempting to protect his own interests and the interests of MdR and KWM in addition to ChanBond, and directly adverse to the interests of his former clients Leane and IPNav, Raskin has argued that the ASA was never enforceable in the first instance.

9.      As set out below, Defendants' conduct is a wholesale breach of their duties to Plaintiffs, and has resulted in significant harm to Plaintiffs.  As such, Plaintiffs bring this action against Defendants for malpractice, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraud.

## THE PARTIES, JURISDICTION AND VENUE

10.      Plaintiff Leane is a foreign national and lawful permanent resident of Texas, residing at 6422 Bryan Parkway, Dallas, TX 75214.

11.      Plaintiff IPNav is a Texas limited liability company with a principal place of business located at 6422 Bryan Parkway, Dallas, TX 75214.  Ms. Leane is the sole member of IPNav.

12.     Defendant Mishcon is a British law firm with a principal place of business located at 70 Kingsway, London, United Kingdom.

13.     Defendant Mishcon NY is a New York limited liability partnership with a principal place of business located at 2 Park Avenue, New York, New York.  Upon information and belief, Mishcon NY ceased doing business in or about January, 2020, but is still an active New York entity.

14.     Defendant KWM is a New York limited liability partnership with a principal place of business located at 500 Fifth Avenue, New York, New York.

15.     Defendant Robert Whitman is a Partner at KWM, a former Partner at Mishcon NY, an attorney licensed to practice in the State of New York, and, upon information and belief, is a citizen of the State of New York residing at 80 Varick Street, Apt 8C, New York, NY 10013.

16.     Defendant Mark Raskin is a Partner at KWM, a former Partner at Mishcon NY, an attorney licensed to practice in the State of New York, and, upon information and belief, is a citizen of the State of New York residing at 300 Mercer Street, Apt 8M, New York, NY 10003.

17.     Venue is appropriate in New York County in that at least Defendants KWM and Mishcon NY are residents of New York County.

## FACTUAL BACKGROUND

A.  ChanBond, IPNav, and the ASA

18.     Plaintiff Leane formed ChanBond on or about August 15, 2014, while she was employed at IPNav's business predecessor, IP Navigation Group, LLC ("IP Navigation").

19.     Like IPNav, IP Navigation was in the business of providing patent monetization consulting services to patent owner clients in exchange for an interest on the recovery generated by the client's patents.

20.     On or about October 31, 2014, IP Navigation's principal, Erich Spangenberg, decided to retire, and turn over his business to Ms. Leane (the "IPNav Transition").  Ms. Leane incorporated IPNav as a new entity through which to engage in the IPNav consulting business.

21.     While employed at IP Navigation, Ms. Leane became aware of the ChanBond patents, when the patents' then-owner, CBV, Inc. ("CBV"), reached out to IP Navigation about potentially monetizing the patents.

22.     CBV and IP Navigation discussed various fee structures by which CBV, IP Navigation, and the vendors and professionals IP Navigation would retain in any licensing-and-litigation campaign would be paid out of the proceeds generated by the licensing-and-litigation campaign.

23.     At all times, IP Navigation clearly communicated to CBV that it would provide consulting services in exchange for a percentage of the "Gross Revenue" derived from the patents – that is, the total money made available to the patent owner by virtue of the licensing-and-litigation campaign.

24.     Eventually, CBV and IP Navigation agreed that the consulting fee would be 22% of the Gross Revenue.  Before the parties came to an agreement on the remaining terms of their relationship, however, the IPNav Transition occurred.

25.     After the IPNav Transition, Leane and CBV agreed that ChanBond would purchase the ChanBond Patents from CBV, on terms documented in a Patent Purchase Agreement dated as of April 9, 2015 (the "PPA").

26.     CBV and Leane also agreed that IPNav could provide patent monetization consulting to ChanBond on the fee terms first discussed by CBV and IP Navigation: 22% of the Gross Recovery.

27.     Reviewing her files in July 2015 in response to requests from litigation funders that she provide documents for their review as they considered funding ChanBond's patent litigation, Leane realized that, despite her intent and CBV's agreement, and the fact that IPNav had been providing consulting services since ChanBond acquired the ChanBond Patents, she had never formally had IPNav and ChanBond enter into an Advisory Services Agreement.

28.     As such, she asked in-house counsel at IP Navigation to re-review the draft ASA (which counsel had last reviewed in early June) and noted she was changing the date on the ASA to reflect that it had been in effect since April 2015 (the time of ChanBond's purchase, consistent with the intent of the parties and the services IPNav had been providing since that date).

29.     On or about July 31, 2015, Leane executed the ASA on behalf of both ChanBond and IPNav, and dated it as of April 9, 2015.

30.     Pursuant to the ASA, IPNav was entitled to 22% of any Gross Recovery obtained by ChanBond on the ChanBond Patents.

B.   Leane Sells ChanBond to UnifiedOnline, Inc.

31.     On October 27, 2015, Leane and UnifiedOnline, Inc. ("Unified") entered into an Interest Sale Agreement ("ISA"), by which Leane sold her membership interest in ChanBond to Unified.

32.     The ISA expressly provided that Unified was taking ChanBond subject to ChanBond's obligations under certain listed contracts, including the IPNav ASA.

33.     Indeed, in a September 2015 email, Billy Carter, Unified's principal, expressly acknowledged that Unified would "assume/honor all engagements re the litigation ie agreements with – IPNAV [sic] …"

C.   The Attorney-Client Relationship Between Plaintiffs & the Mishcon Defendants

34.     On April 20, 2015, ChanBond retained Defendant Mishcon NY to represent it in litigation relating to the ChanBond patents.  While the engagement agreement (Exhibit A, hereto, the "Retention Agreement") identified only ChanBond as the "Client," Paragraph 17 of the Retention Agreement expressly acknowledged that MdR's representation and duties ran to more than just its named client:

> Successors and Assigns.  This Retention Agreement is and shall be binding and inure to the benefit of the Parties and their respective subsidiaries and affiliates, heirs, executors, administrators, legal representatives, successors, and assigns, including successors and assigns of any interest in the [ChanBond] Patents"

35.     Because IPNav and ChanBond were under common control at the time ChanBond executed the Retention Agreement, IPNav was a ChanBond affiliate at the time of the retention.  In addition, IPNav became an assignee of an interest in the ChanBond Patents via the ASA.  For both those reasons, the Retention Agreement "inure[d] to [IPNav's] benefit"

and IPNav was entitled to undivided loyalty from Mishcon NY and its attorneys, including Defendants Whitman and Raskin.

36.     In addition, during the ensuing litigations, Mishcon undertook to represent Ms. Leane personally, defending her deposition as her counsel.

37.     Indeed, at the outset of Ms. Leane's April 24, 2018 deposition, Mr. Whitman identified himself, on the record, as counsel "for Plaintiff ChanBond and Deirdre Leane."

38.     At no point prior to the execution of the Termination Agreement did any of the Mishcon Defendants ever suggest to Ms. Leane, expressly or by implication, that their representation was limited to ChanBond, and not to its affiliates.

D.  The Mishcon Defendants Advise Leane and IPNav to Terminate the ASA

39.     During the course of Ms. Leane's deposition on April 24, 2018, just prior to the lunch break, Ms. Leane testified about the ASA, and counsel for the defendants noted that it had not been produced in the litigation.

40.     On the lunch break, while still representing Ms. Leane and ostensibly protecting her interests, along with IPNav's and ChanBond's – which interests, until that moment, had been completely aligned – Whitman advised Ms. Leane that the failure to produce the ASA was going to create problems for the litigation, and advised her that the best course for the litigation would be for Ms. Leane to terminate and cancel the ASA, and have ChanBond place her in the same economic position by executing a new agreement to that effect at a later date.

41.     According to Whitman, leaving the ASA in place would require reopening document discovery and might severely delay the case and harm ChanBond's chances of recovery.

8

42.     Whitman therefore advised Leane that it would be in everyone's interest –
including Leane's and IPNav's – for IPNav to terminate the ASA, and enter into a different
agreement, at a later date, documenting Leane's and IPNav's 22% interest in the proceeds of
the litigation-and-licensing campaign.

43.     Indeed, both that day and thereafter, the Mishcon Defendants reiterated to Leane
their 100% agreement that she deserved the compensation to which IPNav was entitled under
the ASA given the amount of work she had put into the ChanBond litigations, both before and
after executing the ISA.

44.     Mishcon NY followed up on the advice that terminating the ASA was necessary,
drafting a termination agreement between ChanBond and IPNav and transmitting it to Leane
for signature.

45.     On April 27, 2018, Whitman emailed Leane a copy of the draft Termination
Agreement, writing: "Hello Deirdre, Per our discussion, please find attached a termination of
the advisory services agreement.  If OK, kindly execute and return to me.  I will then have
Billy Execute and I'll send you a final copy.  Kind regards, Bob."

46.     Though IPNav was a beneficiary of the Retention Agreement pursuant to
Section 17 thereof, and though Whitman first advised Leane to terminate the ASA while he
was expressly acting as her personal attorney on the day of her deposition, at no point did
Whitman say or suggest to Leane that he and MdR were not acting as her and IPNav's
counsel in connection with the Termination Agreement.

47.     Though IPNav was a beneficiary of the Retention Agreement pursuant to
Section 17 thereof, and though Whitman first advised Leane to terminate the ASA while he

was expressly acting as her personal attorney on the day of her deposition, at no point did Whitman suggest to Leane that she ought to have independent counsel review the draft.

48.     Consistent with the fact that Leane and IPNav were terminating the ASA only in exchange for ChanBond's agreement to later restore them to an identical economic position, the Termination Agreement was not a unilateral termination by IPNav, which IPNav had the authority under the ASA to execute had it wished to unilaterally terminate the ASA.

49.     Instead, the Termination Agreement provided that ChanBond and IPNav were entering into an *agreement* to terminate the ASA, in exchange for their mutual agreements and "other good and valuable consideration."

50.     The only consideration IPNav received for terminating the ASA was ChanBond's representation and agreement, conveyed by the Mishcon Defendants, that it would execute a separate agreement binding itself to pay IPNav 22% of the Gross Consideration, exactly as it had been required to do under the ASA.

51.     Yet the Mishcon Defendants neither documented that promise in writing, in the Termination Agreement or otherwise, nor advised their clients, Leane and IPNav, that they should require documentation of that promise.

52.     In so doing, the Mishcon Defendants privileged the interests of one client – ChanBond – over another (Ms. Leane and IPNav).

53.     Leane, individually and on behalf of IPNav, relied on the Mishcon Defendants' advice, and the ChanBond promise that the Mishcon Defendants conveyed, in executing the Termination Agreement.

E.  ChanBond Refuses to Uphold Its Promise

54.     In or about October 2019, Ms. Leane reached out to ChanBond to begin the process of having ChanBond execute the contemplated agreement that would restore her and IPNav to their previous economic position.

55.     In response, ChanBond repeatedly reiterated its promise to restore Plaintiffs to their previous economic position, both expressly and implicitly.

56.     For example, on October 16, 2019, Ms. Leane texted Billy Carter, principal of Unified, to inform him that she "didn't see the replacement consulting Agreement" and asking if he had sent it to her Yahoo email account.  The next day, Mr. Carter replied "Email will go out today …"

57.     On October 23, having not received the promised email, Ms. Leane again texted Mr. Carter to inquire about the status.  The next day, Mr. Carter responded that they needed "to talk about the waterfall" before he sent the email.

58.     By "the waterfall," Mr. Carter was referring to the manner in which any recovery on the patents would be distributed among the various players who would be paid from the recovery: first to the litigation funder in agreed amounts, next to ChanBond's attorneys, and so on, until each of the litigation funder, attorneys, IPNav, inventors, and ChanBond had received distributions.

59.     Ms. Leane then asked if Mr. Carter could send her the waterfall "as it currently exists", and he agreed to do so, saying that he needed to make adjustments based on the "latest amendment" of ChanBond's agreement with its litigation funder ("Bentham").

60.     Later that evening, Mr. Carter sent Ms. Leane an email attaching the revised waterfall reflecting, among other things, the terms of ChanBond's amended agreement with Bentham.

61.     Mr. Carter's email was sent at 10:51 p.m. on October 25, 2019 (the "10/25 Email"), and included four attachments: the initial litigation funding agreement with Bentham (which had been executed by Ms. Leane prior to her sale of ChanBond to Unified), two amendments to that litigation funding agreement, and an Excel spreadsheet.

62.     The file name of the Excel spreadsheet attached to the 10/25 Email was "Copy of Chanbond Waterfal_Billy Carter_Final.xlsx" (the "10/25 ChanBond Waterfall").

63.     Fully consistent with the parties' agreement that the "replacement consulting Agreement" would restore IPNav to its economic position under the ASA, the 10/25 ChanBond Waterfall created by Mr. Carter identified the "IPNav Return" as "22% of gross."

64.     Similarly consistent, the 10/25 ChanBond Waterfall Carter created identified the "IPNav Return" as being paid from whatever proceeds were left over after payment of Bentham and ChanBond's litigation counsel.

65.     Despite that confirmation of the parties' agreement that IPNav's 22% interest would be reinstated, ChanBond simply refused to execute an agreement accomplishing that result.

66.     Instead, ChanBond attempted to leverage the fact that the ASA had been cancelled and not formally replaced to extract a settlement from IPNav at a reduced percentage.

67.     After a series of text exchanges where Ms. Leane pressed Carter to sign the reinstated ASA and Carter deflected, in February 2020, Carter finally came clean: He had no intent of reinstating IPNav as had been agreed.

68.     On February 17, 2020, Carter texted Ms. Leane: "I'm not signing another ASA. Rob [Howe] and I executed one when you terminated the previous one to take the Technicolor job.  We can discuss the split or your compensation, but I'm not going to terminate the existing agreement in favor of another one with IPNAV, LLC."

69.     Carter's claim that Ms. Leane had terminated the ASA to 'take a job at Technicolor' was blatantly false.

70.     In fact, Ms. Leane had taken a position as Technicolor's head of IP in June of 2017, roughly a year before Whitman advised her that the case required that the ASA be terminated.

71.     Indeed, Ms. Leane had affirmatively disclosed to Technicolor that she had a connection to and financial interest in the ChanBond litigations, and her position at Technicolor had nothing at all to do with the termination of the ASA.

72.     Thus, Ms. Leane immediately rejected Carter's claim, responding: "No f [sic] way. I had to execute because you didn't disclose during discovery and I spoke to it during deposition.  That was always the deal – you got CB bc I had IPNAV and my big out …"

73.     On February 23, 2020, Ms. Leane texted Defendant Raskin – who by then had left MdR for KWM – to discuss Carter's attempt to renegotiate the deal.  Raskin responded "I spoke with him [Carter] briefly.  He said he's not trying to screw you out of anything but is worried about anything afdexting [sic] the case at this point."

74.     Upon information and belief, the word "afdexting" was meant to be "affecting."

75.     Upon information and belief, Carter had claimed in his discussion with Raskin that he had no objection to reinstating IPNav at the full 22%, as previously agreed, but was

concerned that doing so might somehow negatively impact ChanBond's chances of success in the litigation.

76.     On February 27, 2020, Raskin texted Ms. Leane.

77.     Raskin wrote "[a]t this point I don't think you need the 'ASA' per se.  Just an agreement that you get paid whatever you were supposed to.  I think he said he'd do that."

78.     Upon information and belief, the "he" Raskin was referring to in the text message was Billy Carter.

79.     Upon information and belief, Carter had again conveyed his acknowledgement that, pursuant to the terms of the parties' prior agreement, IPNav was "supposed to" get paid 22% of the gross recovery.

80.     In April 2020, Ms. Leane again reached out to her attorneys at KWM, Raskin and Whitman, to obtain their help in getting the IPNav restoration accomplished.

81.     On April 6, 2020, Ms. Leane forwarded a draft letter agreement reinstating the ASA.

82.     Ms. Leane followed up with Whitman and Raskin throughout April, including in a call on April 9, 2020.

83.     At no point in those discussions did Whitman or Raskin convey that they considered themselves to be representing only ChanBond, to the exclusion of Ms. Leane and IPNav.

84.     To the contrary, their communication was consistent with Ms. Leane's understanding that Whitman, Raskin, and KWM were representing her and IPNav as joint clients with ChanBond.

85.     For instance, on April 23, 2020, Raskin conveyed to Ms. Leane that Carter had not provided comments on the draft, and that Raskin "just g[o]t the sense that he [Carter] is hesitant to do anything so close to trial."

86.     Upon information and belief, ChanBond had not specifically authorized Raskin to convey to Ms. Leane his "sense" of Carter's thought process or their communications.

87.     Were Ms. Leane and IPNav not joint clients of Raskin and KWM, the April 23 disclosure, like Raskin's earlier comments, would have been a violation of ChanBond's privilege.

88.     Despite these acknowledgements and assurances, ChanBond continued to refuse to execute an agreement memorializing the 22% of the gross recovery that the parties had agreed IPNav would be paid.

F.     Raskin and Whitman Abandon Leane and IPNav in Favor of ChanBond

89.     As indicated by the above and upon information and belief, until April 2020, Defendant Raskin appropriately continued to support his clients Leane, IPNav and ChanBond by encouraging ChanBond to follow through on its agreement, and therefore maintaining his disparate clients' alignment of interests.

90.     Upon information and belief, over time Defendants Raskin and Whitman came to realize that Carter had no intention of ever making good on ChanBond's obligations to IPNav under the parties' agreement, placing the interests of their three clients, Leane, IPNav, and ChanBond, in irreconcilable conflict.

91.     Rather than withdrawing from the dispute between their clients, Defendants Raskin, Whitman and KWM decided to side with ChanBond.

92.     On April 30, 2020, Raskin forwarded Ms. Leane a "proposal" from ChanBond, which Raskin said he hoped Leane would find "a reasonable compromise." The proposal suggested that, rather than reinstate IPNav's 22% interest in the Gross Recovery, Ms. Leane and ChanBond would agree that IPNav would take an 11% interest, which interest would also resolve and dispose of Unified's outstanding obligation to pay Ms. Leane $5,000,000 as part of the purchase of ChanBond.

93.     Since then, and in an attempt to pressure Plaintiffs into settling for a reduced interest in the Gross Recovery, Raskin and Whitman have variously asserted that: (1) the parties had never agreed to restore IPNav's 22% interest; (2) Whitman never advised Leane that the ASA needed to be terminated for the benefit of the litigation, adopting Carter's fantastical claim that Leane sought to terminate the ASA for reasons related to her (by-then year-old) job at Technicolor; and (3) that IPNav's ASA was purportedly unenforceable *ab initio*.

94.     Most recently, Raskin affirmatively accused Ms. Leane of committing a fraud by executing the ASA.

95.     By taking positions adverse to Leane and IPNav, Raskin, Whitman, and KWM effectively terminated their representation of Plaintiffs.

96.     At no point prior to doing so did any of Defendants formally terminate their representation of Plaintiffs.

97.     Upon information and belief, Raskin, Whitman and KWM joined in the pressure campaign against their former clients out of concern for their own liability for advising Plaintiffs to enter into the Termination Agreement without formally documenting the consideration supporting the termination.

## COUNT I

### (Malpractice and Negligence, against the Mishcon Defendants)

98.     Plaintiffs repeat and reallege the allegations of Paragraphs 1-97 of the Complaint as though more fully set forth herein.

99.     Upon information and belief, Mishcon and Mishcon NY were affiliates.

100.    Upon information and belief, Mishcon was a partner in or owner of Mishcon NY.

101.    Mishcon identified Mishcon NY to the public as Mishcon's "New York Office."

102.    Upon information and belief, at the time that Ms. Leane retained Mishcon NY on behalf of ChanBond and IPNav, Mishcon's website held Mishcon NY out to the public as a part of Mishcon, rather than a separate entity.

103.    Upon information and belief, upon the closure of Mishcon NY, Mishcon authorized press releases describing the closure of Mishcon's "New York office."

104.    Based upon the nature of the relationship between Mishcon and Mishcon NY, Mishcon is liable for any malpractice or other tort committed by Mishcon NY or any of Mishcon NY's partners in their activities as Mishcon NY partners.

105.    In the alternative, regardless of the actual relationship between Mishcon and Mishcon NY, because Mishcon held Mishcon NY out to the public as an office of Mishcon, rather than a distinct entity as to which Mishcon had no liability, Mishcon should be estopped from denying liability for any torts of Mishcon NY or any of the Mishcon NY partners in their activities as partners of Mishcon NY.

106.    Additionally, Paragraph 17 of the Retention Agreement set forth that the obligations of the Retention Agreement would be binding on affiliates of Mishcon NY.

107.    Upon information and belief, the language of Paragraph 17 of the Retention Agreement was form language that Mishcon NY included in some or all of its retention agreements.

108.    Upon information and belief, Mishcon gave general approval to Mishcon NY to use the language of Paragraph 17 of the Retention Agreement in Mishcon NY's retention agreements.

109.    Alternatively, upon information and belief, Mishcon was generally aware that Mishcon NY used the language of Paragraph 17 of the Retention Agreement in its engagement letters and did not take steps to prevent Mishcon NY from doing so.

110.    As such, Mishcon was bound by the Retention Agreement.

111.    Pursuant to Section 17 of the Retention Agreement, the retention of Mishcon NY inured to the benefit of ChanBond's affiliates.

112.    At the time of the retention, IPNav and ChanBond were under common control.

113.    At the time of the retention, IPNav and ChanBond were affiliates.

114.    In addition, as an assignee of a 22% interest in the Gross Recovery on the ChanBond Patents, IPNav was an "assign[] of any interest in the Patents" under Section 17 of the Retention Agreement.

115.    As such, pursuant to the express terms of the Retention Agreement, the Retention Agreement inured to IPNav's benefit.

116.    Moreover, ChanBond and IPNav had a community of interest relating to the ChanBond Patents and the litigation for which ChanBond had retained the Mishcon Defendants.

117.    IPNav and ChanBond were joint clients of the Mishcon Defendants.

118.    At all relevant times, and until months after Raskin and Whitman left MdR for KWM, Leane reasonably believed IPNav and ChanBond were joint clients of the Mishcon Defendants.

119.    Until late April 2020, Whitman and Raskin behaved as though IPNav and ChanBond were joint clients of the Mishcon Defendants.

120.    For example, as indicated above and on other occasions, Whitman and Raskin would share with Leane the contents of their private conversations with Carter, which would have been privileged against Leane and IPNav but-for the fact that IPNav and ChanBond were joint clients of the Mishcon Defendants.

121.    Moreover, Mishcon Defendants undertook to represent Leane, in her personal capacity, in connection with the discovery in the ChanBond litigations.

122.    Mishcon Defendants communicated with Leane *as her counsel* in connection with the production of documents and her deposition in the ChanBond litigations.

123.    On April 24, 2018, Whitman specifically represented, on the record, that he was appearing as Leane's personal counsel in addition to being counsel for ChanBond.

124.    During a break in the April 24 deposition, while still representing Leane in her personal capacity (as well as IPNav and ChanBond generally in connection with the litigations as joint clients), Whitman advised Leane that issues with the production of documents – on which the Mishcon Defendants were expressly representing Leane in her personal capacity – required IPNav to terminate the ASA for the benefit of the litigation.

125.    Whitman specifically noted that the benefit to the litigation would be to Leane's and IPNav's benefit as well.

126.   Whitman specifically advised Leane that IPNav would not be harmed by terminating the ASA because ChanBond would restore IPNav to an identical economic position by means of a new agreement.

127.   Were the Mishcon Defendants not representing Leane and IPNav as joint clients, providing Plaintiffs with advice as to the advisability of terminating the ASA would have been unethical and in breach of Rule 4.3 of the Rules of Professional Conduct.

128.   Upon information and belief, Whitman was aware that Leane believed the Mishcon Defendants were representing her and IPNav as joint clients with ChanBond, in connection with the Termination Agreement.

129.   In the alternative, and to the extent that the Mishcon Defendants were not representing Leane and IPNav, the Mishcon Defendants should have known that Leane would reasonably perceive them as representing Lean and IPNav, including in connection with the Termination Agreement.

130.   Given the magnitude of the financial impact on IPNav of the termination of the ASA, no reasonably competent attorney would have counseled Leane and IPNav without documenting ChanBond's promise to restore IPNav to the identical economic position by means of a new agreement.

131.   Given the magnitude of the financial impact on IPNav of the termination of the ASA, no reasonably competent attorney would have advised Leane and IPNav to execute the Termination Agreement as drafted.

132.   Given the magnitude of the financial impact on IPNav of the termination of the ASA, no reasonably competent attorney would have failed to advise Leane and IPNav of the risks of executing the Termination Agreement as drafted.

133.     In the alternative, and to the extent that the Court finds that the Mishcon Defendants were not representing Plaintiffs, the Mishcon Defendants negligently or intentionally violated their duty to Plaintiffs as third parties by counseling them to execute the Termination Agreement and allowing Plaintiffs to believe that the Mishcon Defendants were their counsel.

134.     But for the Mishcon Defendants' actions, breaches, and advice discussed above, IPNav would not have executed the Termination Agreement.

135.     As a result, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be in the millions of dollars.

**COUNT II**
(Breach of Fiduciary Duty, against all Defendants)

136.     Plaintiffs repeat and reallege the allegations of Paragraphs 1-135 of this Complaint as though more fully set forth herein.

137.     Plaintiffs were clients of the Mishcon Defendants until Raskin and Whitman left MdR for KWM.

138.     Upon Raskin and Whitman joining KWM, and prior to KWM implicitly terminating the representation by abandoning Plaintiffs and joining in ChanBond's attacks on Plaintiffs, Plaintiffs were clients of Raskin, Whitman, and KWM.

139.     Beginning in or about April 2020, Raskin and Whitman joined ChanBond in arguing, contrary to the interests of Plaintiffs, that ChanBond had no obligation to reinstate IPNav's 22% interest in the Gross Recovery on the ChanBond Patents.

140.     Beginning in or about Spring 2020, Raskin and Whitman joined ChanBond in arguing, contrary to the interests of Plaintiffs, that the IPNav ASA was unenforceable *ab initio*.

141.    Beginning in or about Spring 2020, Raskin and Whitman joined ChanBond in arguing, contrary to the interests of Plaintiffs, that the ChanBond had never agreed to reinstate IPNav's 22% interest in the Gross Recovery on the ChanBond Patents.

142.     Beginning in or about Spring 2020, Raskin and Whitman joined ChanBond in arguing, contrary to the interests of Plaintiffs, that Leane had committed fraud in executing the IPNav ASA.

143.    In so doing, Raskin, Whitman, and KWM breached their fiduciary duty to Plaintiffs.

144.    In so doing, Raskin, Whitman, and KWM implicitly terminated their representation of Plaintiffs, dropping Plaintiffs "like a hot potato" in order to maintain their relationship with ChanBond once ChanBond and Plaintiffs were in conflict.

145.    As a result of such conduct, Plaintiffs have incurred and will continue to incur significant costs and expenses, including costs and expenses relating to asserting their rights as against ChanBond.

146.    Upon information and belief, had Raskin and Whitman advised ChanBond that they would refuse to deny the agreement ChanBond had made with their former clients, IPNav and Leane, to restore IPNav's 22% interest, ChanBond would have executed the required agreement.

147.    Instead, in order to maintain the relationship with ChanBond for the benefit of themselves and KWM, Whitman and Raskin have asserted legal and factual positions they know to be false and/or without merit, to the detriment of their former clients.

148.    In so doing, Whitman, Raskin, and KWM breached their fiduciary duty to Plaintiffs.

149.    In so doing, Whitman, Raskin, and KWM breached their duty of loyalty to Plaintiffs.

150.    As a result of such conduct, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be in the millions of dollars.

151.    In addition, Whitman, Raskin, and KWM's conduct violated the "hot potato" rule, dropping Plaintiffs as clients in order to preserve their relationship with ChanBond.

152.    KWM's continued representation of ChanBond in the patent litigations is likely to require KWM to advise ChanBond on litigation matters as to which ChanBond, on the one hand, and Leane and IPNav, on the other, have divergent and conflicting interests.

153.    Indeed, KWM has already done so.

154.    For example, to protect the value of the shares in Unified that Leane received as partial consideration for her sale of ChanBond, and to protect Unified's ability to pay the $5,000,000 promissory note that was the remainder of the consideration, the ISA contains an anti-assignment provision barring Unified or ChanBond from selling, transferring, or spinning off any interest in the ChanBond's material assets without Leane's written consent.

155.    The ChanBond Patents and litigations were ChanBond's material assets.

156.    A license is an interest in the ChanBond Patents.

157.    Because any settlement of the ChanBond litigations would involve licensing the ChanBond Patents to the defendants, counsel for Leane reached out to KWM for confirmation that ChanBond would not settle the litigations without Leane's consent to the terms thereof, as required by the ISA.

158.    KWM refused to do so, and in fact argued that Unified and ChanBond did not need Leane's consent to patent licenses under the ISA.

159.    In so doing, KWM adopted a position directly contrary to the interests of their former clients.

160.    Based on the foregoing, KWM, Whitman, and Raskin should be disqualified from representing ChanBond in the ChanBond litigations.

161.    Alternatively, KWM, Whitman, and Raskin should be required to disgorge to Plaintiffs some or all of benefit KWM, Whitman, and Raskin obtain as a result of their breaches of their duties to Plaintiffs, including but not limited to their fee in the ChanBond litigations.

**COUNT III**
(Breach of Contract, against all Defendants)

162.    Plaintiffs repeat and reallege the allegations of Paragraphs 1-161 of this Complaint as though more fully set forth herein.

163.    Raskin and Whitman specifically represented to Plaintiffs that, if IPNav agreed to terminate the ASA, they would ensure that IPNav was restored to its economic position by means of a later-executed agreement.

164.    That representation was a promise by Raskin and Whitman to achieve a specific result for their clients, IPNav and Leane.

165.    Raskin and Whitman have not achieved the promised result.

166.    Rather, they have failed to achieve that result and neglected to take steps that would have made that result possible, both while at MdR and while at KWM.

167.    For instance, during the time that Carter was indicating he still intended to restore IPNav's 22% interest, Whitman and Raskin could have, but did not, provided written confirmation that ChanBond had agreed to reinstate IPNav as consideration for Ms. Leane executing the Termination Agreement.

168.    Such written confirmation would have prevented ChanBond from later reneging on the agreement, by rendering any attempt to do so.

169.    Providing such written confirmation would not have violated any duty of Raskin or Whitman to ChanBond, as at the time ChanBond was still expressing an intent to follow through on its agreement.

170.    Whitman and Raskin's failure to provide the promised result constitutes a breach of contract.

171.    Each of MdR and KWM are liable for Whitman's and Raskin's breach of contract.

172.    Plaintiffs have been harmed by Defendants' breach of contract in an amount to be determined at trial, but which is reasonably believed to be in the millions of dollars.

**COUNT IV**
(Aiding and Abetting Breach of Fiduciary Duty, against Raskin, Whitman, and KWM)

173.    Plaintiffs repeat and reallege the allegations of Paragraphs 1-172 of this Complaint as though more fully set forth herein.

174.    IPNav and ChanBond had entered into a common interest agreement dated as of April 9, 2015, reflecting their common interest in obtaining a favorable outcome to ChanBond's licensing-and-litigation campaign.

175.    IPNav executed the Termination Agreement at the urgings of Whitman and Raskin for the express purpose of benefiting ChanBond's litigation success, in the pursuit of that common interest.

176.    In so doing, IPNav reposed trust and faith in ChanBond that ChanBond would fulfill its promise to later restore IPNav to its economic position prior to terminating the ASA.

177.    IPNav did so because it, Raskin, Whitman, MdR, and ChanBond were dealing with each other not as arms'-length participants in the market, but as entities with a common purpose dealing with each other in a relationship of trust and confidence.

178.    Under the circumstances, ChanBond had a fiduciary duty to IPNav to fulfill the executory portion of the Termination Agreement and provide IPNav with the agreed consideration therefor: a new agreement restoring IPNav's 22% interest in the Gross Recovery on the ChanBond Patents.

179.    Whitman, Raskin, and KWM were fully aware of ChanBond's fiduciary duty to IPNav in that regard.

180.    ChanBond's refusal to execute the contemplated agreement is a breach of its fiduciary duty to IPNav.

181.    Despite that, Whitman, Raskin, and KWM have aided and abetted ChanBond's breach of its fiduciary duty to IPNav.

182.    As a result of the foregoing, Plaintiffs have been injured in an amount to be proven at trial, but which is reasonably believed to be in the millions of dollars.

**COUNT V**
(In the Alternative, Aiding and Abetting Breach of Contract
Under Texas Law, against Raskin, Whitman, and KWM)

183.    Plaintiffs repeat and reallege the allegations of Paragraphs 1-182 of this Complaint as though more fully set forth herein.

184.    The vast bulk of the interactions described herein, including Ms. Leane's deposition, occurred while the parties were in Texas.

185.    Plaintiffs are based in Texas.

186.    To the extent that Defendants deny that their relationship with Plaintiffs is governed by the Retention Agreement, and the finder of fact concludes that Defendants' relationship with Plaintiffs is not governed by the Retention Agreement, Plaintiffs' claims against Defendants would be governed by Texas law.

187.    Texas law recognizes a claim for aiding and abetting a breach of contract.

188.    ChanBond was contractually obligated to enter into an agreement restoring IPNav's 22% interest in the Gross Recovery on the ChanBond Patents.

189.    Whitman, Raskin, and KWM were aware of said contractual obligation.

190.    Whitman, Raskin, and KWM undertook a course of conduct designed deliberately to aid ChanBond in its attempts to breach said contractual obligation.

191.    As a result of the foregoing, Plaintiffs have been harmed in an amount to be proven at trial, but which is reasonably believed to be in the millions of dollars.

**COUNT VI**
(In the Alternative, Fraud or Negligent Misrepresentation, against Whitman and MdR)

192.    Plaintiffs repeat and reallege the allegations of Paragraphs 1-191 of this Complaint as though more fully set forth herein.

193.    This count is pled in the alternative, to the extent that Defendants assert that ChanBond never agreed to restore IPNav to its prior economic position in exchange for terminating the ASA.

194.    In his discussions with Ms. Leane relating to the Termination Agreement, Whitman assured Ms. Leane that ChanBond would agree to restore IPNav to its prior economic position if she terminated the ASA.

195.    Whitman subsequently urged Ms. Leane to sign the Termination Agreement on the basis of their prior discussion.

196.   Given the prior representation by Whitman, Whitman and MdR had an obligation to affirmatively disclose to Leane that ChanBond had not agreed to restore IPNav to its prior economic position if she terminated the ASA.

197.   Given the relationship between Leane and IPNav on the one hand, and Whitman, Raskin, and MdR on the other, Whitman and MdR had an obligation to affirmatively disclose to Leane that ChanBond had not agreed to restore IPNav to its prior economic position if she terminated the ASA.

198.   To the extent that Whitman deliberately decided not to disclose to Ms. Leane that ChanBond had not agreed to restore IPNav to its prior economic position, upon information and belief he did so out of concern that Ms. Leane would not execute the Termination Agreement if he conveyed that information.

199.   If so, Whitman's failure to disclose that information was fraudulent.

200.   In the alternative, to the extent that Whitman and MdR simply forgot to disclose ChanBond's lack of agreement, or to confirm with ChanBond that it would restore IPNav to its prior economic position as Whitman had promised, Whitman and MdR were negligent in failing to do so.

201.   Plaintiffs were damaged by Whitman's and MdR's failures of disclosure in an amount to be proven at trial, but which is reasonably believed to be in the millions of dollars.

**WHEREFORE**, Plaintiffs respectfully request a judgment:

(1) On the First through Sixth Causes of Action, in an amount to be proven at trial, punitive damages to the extent applicable, and an award of costs, fees, and interest as allowed by statute or the parties' agreements;

(2) On the Second Cause of Action, an order barring KWM, Raskin, and Whitman from

    representing ChanBond in the ChanBond litigations, disgorgement of fees related to

    such representation, and an award of costs, fees, and interest as allowed by statute or

    the parties' agreements; and

(3) Such other and further relief as the Court deems just and proper.

Respectfully submitted,

KAMERMAN, UNCYK, SONIKER &
  KLEIN P.C.

By:     *Akiva M. Cohen*
    Akiva M. Cohen, Esq.
1700 Broadway, 16th Floor
New York, New York  10019
(212) 400-4930
acohen@kusklaw.com

*Attorneys for Plaintiffs*